**TRANSCRIBED FROM DIGITAL RECORDING**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
       vs.                     ) No. 17 CR 576-1
                               )
NATHANIEL MCELROY, et al.,     ) Chicago, Illinois
                               ) September 7, 2017
          Defendants.          ) 3:54 P.M.

TRANSCRIPT OF PROCEEDINGS - Detention Hearing
BEFORE THE HONORABLE SUSAN E. COX, Magistrate Judge

APPEARANCES:

For the Government:       HON. JOEL R. LEVIN
                          219 South Dearborn Street
                          Chicago, Illinois  60604
                          BY:  MR. ALBERT BERRY

For the Defendant:        MR. JOSHUA BATEMAN KUTNICK
                          900 West Jackson Boulevard
                          Suite 5W
                          Chicago, Illinois  60607

ALSO PRESENT:             Mr. Patrick May
                          United States Pretrial Officer


PAMELA S. WARREN, CSR, RPR
Official Court Reporter
219 South Dearborn Street
Room 2342
Chicago, Illinois   60604
(312) 408-5100

**NOTE:  Please notify of correct speaker identification.
FAILURE TO SPEAK DIRECTLY INTO THE MICROPHONE MAKES PORTIONS
UNINTELLIGIBLE.**

(Proceedings held in open court:)

THE CLERK:  17 CR 576, USA versus Nathaniel McElroy.

MR. KUTNICK:  Good afternoon, your Honor.

THE COURT:  And your name is?

MR. KUTNICK:  My name is Joshua Kutnick, K-u-t-n-i-c-k.

This is Nathaniel McElroy.  He's present here in custody.

THE COURT:  Good afternoon, sir.

MR. BERRY:  Good afternoon, your Honor.  Albert Berry, B-as-in-boy-e-r-r-y, for the United States.

THE COURT:  Good afternoon to you.

MR. MAY:  Good afternoon, your Honor.  Patrick May on behalf of pretrial services.

THE COURT:  Mr. May, good to see you.

Okay.  So as I understand it, the defendant was arraigned by Judge Weisman last week.  And, you know -- but I am the assigned magistrate judge, so it is my job to handle the detention hearing.

So we're here for a detention hearing today?

MR. BERRY:  That's correct, your Honor.

THE COURT:  How would you like to proceed?

MR. BERRY:  I'd like to proceed by proffer, if that's okay with the Court.

THE COURT:  Okay.  Is that all right with you?

MR. KUTNICK:  No objection, your Honor.

THE COURT:  Okay.  Well, then why don't you go ahead.

And if you want to take a seat, you may.

MR. KUTNICK:  Okay.

THE COURT:  What is the basis for the motion?

MR. BERRY:  Your Honor, our basis is that the defendant is a danger to society as a whole.

THE COURT:  Uh-huh.  So danger to the community?

MR. BERRY:  Yes, your Honor.

THE COURT:  Uh-huh.  Go ahead.

MR. BERRY:  Thank you.

Initially we will start with the indictment in this case.  The defendant has been indicted essentially for gun trafficking.  This is a conspiracy to bring guns from Michigan to Chicago.  We know the scourge that the guns have -- that guns have in this city and what it's done to the city, the violence and everything else going on.

This defendant is a member of a Gangster Disciples faction of their gang called Goonie, G-o-o-n-i-e.  Now there is two separate factions of that gang.  There is Goonie Boss, which are the older members.  And there is the Goonie Gang, which are the younger members or the members they call shorties or individuals who are under 18 years old.

Now our investigation has showed that this defendant was an individual, the main individual, that provided firearms

to these juveniles and for members of the gang.

One of the ways to provide those firearms is outlined in the indictment, which the defendant goes up to Michigan, uses people that he knows from there to find a straw purchaser. Those individuals buy guns. And they're paid an extra 100 to 150 dollars. These guns are brought back to Chicago for use.

Now when we talk about danger to society, one of the first things we have is that, as we can tell these days, everyone's life is lived on Facebook.

THE COURT: Not mine.

(Laughter.)

MR. BERRY: Is lived on Facebook, and Facebook has -- it shows two different sections of an individual.

THE COURT: Uh-huh.

MR. BERRY: Now there is a section that's out for everyone to see, and there is also the Facebook that individuals don't see much of.

Now I have provided the Court, and I have provided defense counsel, with a copy of some photos from Facebook. And I would like to -- when I'm -- after I'm done describing them, it goes into evidence as a group exhibit, as Group Exhibit Number 1.

THE COURT: Do you have a sticker for these?

MR. BERRY: I do not, your Honor, and I apologize.

THE COURT: Do you have one?

I'll just put one on there.

All right.  I'll just write it on here.

MR. BERRY:  Thank you, your Honor.  And I apologize for that.

THE COURT:  That's okay.  Government Group Exhibit 1.

Okay.  Go ahead.

MR. BERRY:  Now when we look at the first picture that I have provided with -- the Court and to defense counsel, this is a picture of five individuals in here.

THE COURT:  Uh-huh.

MR. BERRY:  This picture is taken or uploaded on November 9th of 2016.  That's one of the dates that the government has where the defendant was in Michigan on that date.

THE COURT:  Uh-huh.

MR. BERRY:  Now three other individuals that are in this photo have been indicted in this case.  The first one, all the way to the left with the braids, that's Reginald Johnson, nicknamed Rico.  He's one of the individuals that provides straw buyers to be able to buy the guns.

The second one is an individual named -- he's in the back, Jaybeon (phonetic) Bush, who is a minor.

THE COURT:  Uh-huh.

MR. BERRY:  And that's the individual that's holding the gun in this case.

THE COURT:  Uh-huh.

MR. BERRY:  The next one is Melena (phonetic) McElroy, who is the defendant's brother, who is also a minor.

Behind him you have Lashon, who is Chop, who was also indicted in this case.

And then you have the defendant smiling with his phone in his hand --

THE COURT:  Uh-huh.

MR. BERRY:  -- ostensibly taking pictures of this gun.

When you move a couple of pages later, you have another picture.  This picture shows the defendant pointing the gun directly into a camera.  And this picture was also posted on Facebook.

And next to him is his juvenile brother with a gun, with an extended magazine with a barrel on it -- barrel around it.

It shows the nature that these -- the defendant and his friends have in how they point these guns and how the -- what they think of these firearms.

What we have after that is there is just two pictures, pictures of firearms that the defendant has posted on Facebook.

The second one is followed by a conversation in which the defendant seems like he's attempting to sell that firearm. It states, tell him call me.  He says, I have eight shots. Someone asked, what's your number.

THE COURT: Where are you? I'm sorry.

MR. BERRY: Oh, I am -- I'm sorry, your Honor. If you -- the second gun is -- it says page on top 76264.

THE COURT: Okay. I have got it.

MR. BERRY: And then when you go to the next page, the author, it says Goonie McElroy.

THE COURT: Yeah.

MR. BERRY: That is the defendant's Facebook page.

THE COURT: I see, yeah.

MR. BERRY: The body -- he said, that's a 41 mag.

THE COURT: Oh, I see. Yeah, I gotcha.

MR. BERRY: And then as we go -- as we go down through that, there is conversation that shows that he's attempting to sell that firearm.

And when you go to the next to last page of this group exhibit, we see again the defendant with his brother. He's drinking -- the defendant is drinking something. In his hand he has what we would characterize as a small baggie of narcotics.

THE COURT: Uh-huh.

MR. BERRY: Inside his waist -- and I understand the picture may be a little dark --

THE COURT: No, I can see it.

MR. BERRY: -- it is the handle of a firearm.

THE COURT: Uh-huh.

MR. BERRY: And there is his brother next to him, his juvenile brother again --

THE COURT: Uh-huh.

MR. BERRY: -- pointing a firearm.

THE COURT: How old is his brother? You said he's a juvenile. How old is he?

MR. BERRY: I believe he's 17, your Honor.

THE COURT: Uh-huh. Okay.

MR. BERRY: Now if you start there, you move along, and we show that that's not all that the defendant does on Facebook.

At this time I'd like to play one video for the Court.

THE COURT: Certainly.

MR. BERRY: If I may.

THE COURT: Any objection?

MR. KUTNICK: No, your Honor.

THE COURT: Okay.

MR. BERRY: And, your Honor, I won't narrate the videos, I'll let the video speak for itself.

THE COURT: Okay.

MR. BERRY: But I may have some comments afterwards.

THE COURT: Okay. Sure.

MR. BERRY: Thank you.

(Videotape played.)

MR. BERRY: Your Honor, if I just may talk about that

a little bit.  You see a cavalier attitude, which the defendant and defendant's brother and his friends displaying guns into the camera.  Now this is --

THE COURT:  Where was this video taken?

MR. BERRY:  This video was on Facebook.  That's how -- that's where I --

THE COURT:  Right.  But where is the -- do you know where the -- where the --

MR. BERRY:  In Calumet City.

THE COURT:  Okay, uh-huh.  Go ahead.

MR. BERRY:  Which is the house of his cousin.

Is that correct?

THE COURT:  Okay.

MR. BERRY:  The house is his cousin's home.

Now this isn't just a Facebook video that's put out a couple of days later, this is actually a Facebook Live video, which is something that's seen by everyone who wants to see it at the time that it is happening.

You can tell in the video they look into the phone, it appears like they're reading something.  That's how you can tell that that's one of the Facebook Live videos.

THE COURT:  Uh-huh.

MR. BERRY:  Now in this video it is just not regular guns, there is also extended magazines.  The defendant is holding a gun with a laser site.

There is also a gun that has a drum on the bottom which holds 50 bullets.

Now what's particularly disturbing about this video also is they keep talking about an individual named D-Money.

THE COURT: Yeah, I heard that.

MR. BERRY: Now D-Money is an individual name Devon Haritz (phonetic) who was murdered in Chicago.

THE COURT: Uh-huh.

MR. BERRY: Now Devon Haritz was riding in a car, and two individuals came out of the gangway, shot him, and killed him.

Devon Haritz's car kept going, crashed. He was found on the side of the road. He was found in the street with shoes. And why is that in particular? These individuals are talking about he was trying to go back for his shoes.

THE COURT: Uh-huh.

MR. BERRY: They know what happened there, and they're laughing about it. They're jumping around about it. Talking about how he's in the air. He's up there. This is what they're talking about.

Now they are also talking about an individual named Big Ed. That's a homicide that's being investigated. This defendant talks about how he went to a restaurant and shit all over himself, if I may -- pardon my language.

THE COURT: Uh-huh.

MR. BERRY:  Now that's -- that's a homicide that's being investigated.  This is an individual who is talking about that on the Facebook Live video.

Now I do have another Facebook Live video that I could play.  It is over ten minutes long.

THE COURT:  Uh-huh.

MR. BERRY:  In that video the defendant is there. He's there with his brother.  Some of the same individuals.  I believe they are in the same house --

THE COURT:  Uh-huh.

MR. BERRY:  -- pointing a different set of guns at the camera.

THE COURT:  Uh-huh.

MR. BERRY:  They're talking in that about the opps. Now when -- from my understanding, the opps terminology is for the opposition gang.  And as they're talking about the opps, they are talking about, why don't you pop out, why don't you come out, I'm out there, I'll be out there on Facebook Live with guns, live guns, talking about how they'll go out there and they'll shoot all the individuals.  It is not just the members that he hangs around, it is this defendant also.

THE COURT:  Uh-huh.

MR. BERRY:  Now I took a look at the pretrial report also.

THE COURT:  Uh-huh.

MR. BERRY: The pretrial report states -- it has an address in that pretrial report where his mother lives.

THE COURT: Yes.

MR. BERRY: I don't have the address. I know it is on Throop.

THE COURT: Yes. 6913 South Throop.

MR. BERRY: 6913 South Throop.

Now when the defendant was arrested, he gave a statement to the FBI. Further along in that statement he tells the FBI that his mother is homeless, that he's the only person that takes care of his mother.

THE COURT: Uh-huh.

MR. BERRY: He's the one that gives her money. Right?

As a matter of fact he had $3600 in cash in his pocket that he wanted his mother to take from him when he was arrested.

Now after the pretrial services report came and the address was -- I saw the address --

THE COURT: Uh-huh.

MR. BERRY: -- I spoke with agents of the FBI and from CPD who went out to that house today. They rang the doorbell. And from my understanding, an older woman answered the door. And she said that she lived there with her daughter. She said that she didn't know anybody with the name Nathaniel McElroy. She didn't know any McElroys or maybe her daughter did.

Her last name was Shields, S-h-i-e-l-d-s.

THE COURT: Uh-huh.

MR. BERRY: Her daughter, I believe, was Elizabeth Shields.

THE COURT: Uh-huh.

MR. BERRY: The agent said there was one room with a lock on it. But this woman said she had no idea who these individuals were.

You take that, and you couple it with the defendant saying that his mother was homeless, I don't even believe that this address is an address where he could go.

Now it is our contention that he shouldn't go there anyway as -- I don't believe that his mother can be a sufficient third-party custodian.

THE COURT: Uh-huh.

MR. BERRY: She has two kids in this video who are pointing firearms. She has a third son Jolicious (phonetic) Terman (phonetic). Jolicious Terman was arrested the same time this defendant was for first degree homicide in Cook County.

THE COURT: Uh-huh.

MR. BERRY: Jolicious Terman had just gotten out of prison for being in possession of ammunition. That ammunition was stolen from a Jeep. That Jeep, which was stolen, was used to breakthrough the front of a gun store in Streator, Illinois. And we have that case indicted in this courtroom, 17 CR 371.

We have three individuals indicted in that case.

THE COURT: Uh-huh.

MR. BERRY: His brother was in possession of those -- of those bullets.

Twenty firearms were stolen from that -- from that place. Only five or six have been recovered.

I believe that not only is the defendant dangerous because of the guns that we see there, but that there are also guns that are outside that are still not recovered.

THE COURT: Uh-huh.

MR. BERRY: Now I know just also his girlfriend that takes -- that's talked about in this has been, from my understanding in talking to the agent -- there is a Facebook page from his girlfriend Debbie Rose (phonetic), and she also posts a picture of a her holding a gun.

THE COURT: Uh-huh.

MR. BERRY: It is also my understanding that she has a FOID card, and she recently purchased ammunition.

THE COURT: I'll mark that Government's Exhibit 2. Okay.

MR. BERRY: So, your Honor, at this time, I -- I would rest. And I will state that the defendant is a danger to the community. If it is necessary, I would play the other video for the Court to see that. As I say it is over ten minutes.

And I don't think that there is any suitable third-

party custodian that can stop this defendant or protect the community as a whole.

THE COURT: Thank you.

MR. BERRY: Thank you, Judge.

THE COURT: Your response, please.

MR. KUTNICK: Can I just briefly have a moment to ask his mother one question?

THE COURT: Certainly.

MR. KUTNICK: Thank you.

(Brief interruption.)

MR. KUTNICK: Thank you, your Honor.

Your Honor, as I sat and watched this video another time, because I had seen it previously, I couldn't help but think that your Honor is in a tough position because this is certainly an inflammatory video.

THE COURT: Uh-huh.

MR. KUTNICK: It's certainly something that makes anybody think, oh, my gosh, this is a scary situation.

THE COURT: Uh-huh.

MR. KUTNICK: But the reason why your Honor has the hard job is because these are the hard decisions to make because what we have here is a 20-year-old kid, and that's what he is, he's a kid. Just because he has a two in front of his age doesn't make him an adult. And certainly the way that he is acting on that video with those other juveniles is something

that is not responsible, that is dangerous, and it would make someone think that he is dangerous.

However, your Honor, just because there is a culture that is going on in this city, and it is a culture that has both negative and positive aspects to it. The negative aspects we read about every single day when we wake up and read the paper. The positive aspects we don't necessarily hear so much about.

But there is a community, there is a group, and there is loyalty, and there is family connection. And so, your Honor, I ask you to look at this video and say that these are kids --

THE COURT: Uh-huh.

MR. KUTNICK: -- being kids, not in a way that is breaking a window, but in a way that now in this day and age of social media there has become a new component to everything, which is sharing.

THE COURT: Uh-huh.

MR. KUTNICK: And it looks to me like people share a bit too much out there of their personal lives, and this is very much something that -- that is way, way, way too much sharing.

THE COURT: Uh-huh.

MR. KUTNICK: But I would just stress to the Court to not be swayed by the dangerous-looking aspect of this video and

think more about the fact that we have a 20-year-old kid here who has extensive family support, as you see in the courtroom here today.

These are his sisters, his girlfriend, his son is here, his mother is here.

Your Honor --

THE COURT: How old is his son?

MR. KUTNICK: His son is two years old. And, your Honor, his son's mother basically, after his son was born, said, here you go, and left it to Nate to care for his son during the last couple years. And, of course, Nate has relied upon his family's help for that.

But he has a good job, your Honor. And he works as a mover. And he's a very hard-working person, and he makes a decent living in that hard-working capacity. And he uses that money to help support his family, his mother, his son.

And, your Honor, he's presumed innocent at this stage. And that is a strong presumption. This is not a presumption of detention case.

So what the Court is called upon to do is to try to fashion some conditions that would effectuate the purposes of bond, which would be, is he a flight risk? Well, the government didn't even argue that so we won't go there.

Is he a danger to the community based on that video? Your Honor, that is Facebook Live. So not only is that them

posting a video of them doing this activity, but is there being responded to in realtime. And that's why they're looking at the phone because people are saying things about what they're doing.

And if you think about what that technology could do to a young impressionable mind, a kid, it will make them act up more. So it is almost as if you have like a boasting or puffery going on. That's what this is.

It is not, we're going out to kill so and so. Even if in any kind of slang terms, that is not what they are saying. It is, hey, here we are, this is what's here.

And it is boasting, and you can tell that it is because of that interaction between those individuals and the people on the other side of the camera, if you will.

Your Honor, the government brings up the fact that Mr. McElroy's -- Mr. McElroy's brother was involved -- was arrested for homicide at the same time.

THE COURT: Uh-huh.

MR. KUTNICK: That's not Nate, that's his brother.

THE COURT: I know, but you're suggesting that I release him. And pretrial services is suggesting that I release him to his mother.

I think the government's point is that, you know, you have got three children now that are in serious trouble with the law. That's the point I took from it so --

MR. KUTNICK: Well --

THE COURT: You know, when you're evaluating a custodian, you have to look at all of the factors. That's -- the suggestion is that the 17-year-old son is with his brother.

MR. KUTNICK: But, your Honor, that was exactly --

THE COURT: And the guns.

MR. KUTNICK: I'm sorry?

THE COURT: No. That's all right, I interrupted you.

MR. KUTNICK: No, that was exactly the question I wanted to ask.

THE COURT: Uh-huh.

MR. KUTNICK: His mother, which is where is -- his other brother is (unintelligible) his aunt. And I -- when -- she said that she would be able to make arrangements that he not reside in the same household as Nate. And, I mean, if that -- if you -- if the Court wanted that to be a condition that he not be permitted to reside in the residence with his brother, then they could attempt to find family members where his brother could reside at a different location.

But in terms of his girlfriend and whether she has a FOID card, I mean, a condition of any release that Nate would have would be that he had no contact with any firearms or firearms ammunition whatsoever. That would be a condition that we would readily agree to. And if he was in the presence of any of those things, he would be in violation.

I also just wanted to mention that the government brought up about this robbery of a gun store in Streator. There is no allegation here that Nate had anything to do with that, that he was involved with that whatsoever.

So that is something that the Court should disregard. It is not related to this case. There might be tangential people related to it, but it is not anything that Nate is accused of.

Your Honor, overall he -- he's a young -- oh, I wanted to point out something about his history --

THE COURT:  Uh-huh.

MR. KUTNICK:  -- in his bail report that I -- that the Court would note, and I think that it merits explanation.  All of his juvenile criminal history, your Honor, is quite minor. They are all -- they are all misdemeanors.

The only thing that jumped out at me is something that the Court might take pause with or be concerned about or --

THE COURT:  Aggravated unlawful use of a weapon at age 16.

MR. KUTNICK:  Exactly.

THE COURT:  And battery at age 15.

MR. KUTNICK:  Well, certainly the aggravated unlawful use of a weapon is something that I wanted to address to the Court because I think it is worth explanation.

THE COURT:  Uh-huh.

MR. KUTNICK: That was a situation where Nate was in a vehicle. He was the passenger in a vehicle. And there were six individuals in the vehicle. There was a driver. He was the front passenger. And then there were four people in the back.

THE COURT: Uh-huh.

MR. KUTNICK: A gun was found in the trunk of that car. And the reason it says further disposition unknown is because that case was dismissed.

That is a situation that a young person driving around in this city could find themselves in, and I would just ask that the Court not use that in any way to determine that he was not eligible for release.

In terms of the other things, your Honor, possession of cannabis, even the misdemeanor battery, I mean, the domestic is -- was something with his sister that was certainly worked out within the family. He's not showing any type of violence. He's certainly never used a weapon as reflected by this criminal history.

So, your Honor, given the fact that he has substantial connections in the community, I understand that your -- the Court is having reservations about his motion. However, your Honor, this is the person who he (unintelligible) for him.

THE COURT: Uh-huh.

MR. KUTNICK: This is the person -- this is --

hopefully, all of our mother's would be able to stand up for us and to be there for us if it came time for someone to stand behind them.

So, your Honor, I think that the pretrial assessment is correct.

Oh, by the way, regarding a statement regarding the house, because we just dealt with this right before court here today, I brought that to his mother's attention, that the agents had gone to the home and that they had said, well, wait a minute, they don't know anything about you there. I actually pulled out my phone, pulled up the address, showed her the picture, and I asked her, is this the house? She said, absolutely. I said, do you live there? She said, yes.

Who do you live there with? I live there with my kids.

And she also said that her god daughter does live there, and her only thought is by -- her god daughter, and her god daughter's mother. And her thought is that they didn't know who these people were at their door asking about who lives there, you know. They weren't sure what to say or should say, so that is why they denied knowing her.

That is the address, your Honor. It would be easily confirmed by a visit by pretrial while they are present. And, your Honor, that is a house in the City of Chicago, and it is easily monitored. This is something that we can do in order to

assure his presence in court, ensure he does not get in any more trouble while he is on release.

And, your Honor, we ask you to find, despite the video, that he is a young, young man who has not had any substantial entanglements with law enforcement up to this point, and we ask you to consider release.

THE COURT: Thank you.

Any response, Mr. Berry?

MR. BERRY: Just briefly, your Honor. The first thing is from my question -- is from my understanding, I -- just first from the (unintelligible) in his waist and not on top of the car.

THE COURT: Uh-huh.

MR. BERRY: That's the first thing.

And other than that, your Honor, I have nothing else to add in.

THE COURT: Well, okay. The law requires me to, before I detain someone based on danger to the community, that the government prove by clear and convincing evidence that that is the case. My view of the record in front of me is that the government has sustained that burden.

I start with the charges. That's always the place where I start because I can't view the video in isolation from the charges. The charges are essentially that this individual, Mr. McElroy, has been involved in a drug trafficking scheme,

which is essentially, according to the grand jury, which found probable cause to sustain this charge, is responsible for moving weapons, serious and dangerous weapons, from Michigan to Illinois. So I start with that. And it is a serious crime and -- and it is -- inherently in my mind falls into sort of the dangerousness of a category. But that on its own, of course, would not sustain a finding.

You know, I thought -- I thought, McElroy, that your lawyer did a excellent job defending your position here. And something he said really struck me. This video -- well, first of all, the Facebook pictures tend to corroborate independently the allegations that are in the indictment because it seems pretty clear from the comments along with the pictures of the guns that they're an effort to further traffic in dangerous weapons.

But, you know, when I looked at the video, I thought to myself, you know, the -- the glee and exuberance with which these individuals are handling, brandishing guns that their only purpose is to kill other people, and that they are taking joy, glee in -- in touching them, pointing them, talking about how they were used on the street, you know, that was something so troubling to see such young people who ought to be, you know, out there playing basketball and taking the joy in something like that. Doing that with these incredibly dangerous weapons, it is appalling to me.

And it -- the idea that I can release this guy into his mother's home, you know, and I'm not even sure she lives where she says she does.

But let's assume you're right, and it was one of these things, and, you know, that doesn't lack credibility to me. You know, people show up at a door. People are suspicious of police and law enforcement in many neighborhoods. And, frankly, there is some -- there are reasons why that is so that have nothing to do with this case. But -- but that location monitoring, third-party custodians, it doesn't deal with somebody who is dangerous, truly dangerous. And it is my belief, based on looking at that video, that this individual has absolutely no respect or -- or understanding that what he's dealing with is incredibly dangerous stuff.

I -- I have never seen anything like this in my life. It is -- it is shocking to me that you could laugh about a gun like it is a toy.

You're not suggesting -- you know, I understand what you are saying, like Facebook, this is what kids do, right? But fact that these kids are doing it with these weapons in this context, it is just tragic. It is tragic. Some of those kids look like they were 14 or 15 years old. And this is their life?

I can't do anything about that, but I can tell you what I can do. This individual is dangerous. He's not getting

released on bond.  He's going to have to face his charges as a detained defendant because I cannot -- I find -- I think the government has more than sustained its burden that he's a danger.  He's a danger to the community, and I cannot trust him on the outside given what I have seen.  That is my ruling.

Anything further?

MR. BERRY:  Just one thing, your Honor.  At the moment the case --

THE COURT:  I know it is sealed.

MR. BERRY:  So this record is sealed?

Well, what I would like to ask you to do is unseal it. I believe we have -- we have had it sealed for a reason --

THE COURT:  Yeah.

MR. BERRY:  -- but I think we're okay.

THE COURT:  All right.  Well, then the record is unsealed.

MR. BERRY:  And the whole case, can we do that too?

THE COURT:  Yeah, I can unseal the whole thing.

MR. BERRY:  Thank you, your Honor.

THE COURT:  You need to -- you need to write up a detention order.

MR. BERRY:  Okay.

THE COURT:  Okay?

MR. BERRY:  I will do that.

THE COURT:  All right.  Based on danger to the

community.

MR. BERRY:  Okay.  Thank you, your Honor.

(Which concluded the proceedings.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the digital recording of proceedings in the above-entitled matter to the best of my ability, given the limitation of using a digital-recording system.

*/s/Pamela S. Warren*                        January 26, 2018
Official Court Reporter                              Date
United States District Court
Northern District of Illinois
Eastern Division