UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | 17 CR 576-1 |
| v. ) | |
| ) | Judge Jorge L. Alonso |
| NATHANIEL MCELROY ) | |

**GOVERNMENT'S POSITION PAPER AS TO
SENTENCING FACTORS**

The illegal trafficking of firearms has had a long lasting and devastating effect on communities in Chicago and its surrounding suburbs. Nathaniel McElroy is one in a long list of individuals that has contributed to the pain inflicted upon families due to the gun violence in Chicago. He circumvented the laws of Illinois, purchased firearms from Kalamazoo, Michigan, and brought them back into the state to wreak havoc on violence plagued neighborhoods, in Chicago and its surrounding suburbs. In purchasing the firearms, McElroy paid straw buyers an additional $150 per transaction to fill out federal paperwork in an effort to conceal the true purchaser of the weapon, himself. All of this was done in an attempt to thwart law enforcement's efforts to hold him responsible for the actions of him and his gang, Goonie Boss/Goonie Gang ("Goonie"), a gang of young adults and juveniles that shot and murdered numerous people in the Southside of Chicago.

McElroy is charged with a conspiracy to straw purchase and traffic ten firearms from January 2017 through June 2017. Five of those were purchased by a confidential informant and immediately turned over to the FBI. The other five

firearms were straw purchased for McElroy and members of Goonie. Of those five:

(a) Two have yet to be recovered;

(b) One was recovered on March 4, 2017 in Hammond, Indiana from a then juvenile Goonie member;

(c) One was recovered on May 18, 2017 from a home in Calumet City, Illinois that belonged to and was occupied by a number of juvenile and young adult Goonie members. This firearm was subsequently linked to two shootings in the Southside of Chicago; and

(d) One was recovered on December 27, 2017 from the scene of a homicide and was subsequently linked to a separate homicide that occurred on September 26, 2017.

As is set forth below, the government requests a sentence towards the high end of the guidelines range of 41 to 51 months' incarceration, more specifically 51 months' incarceration, along with three years of post-release supervision, on each count to run concurrently. Additionally, the court should impose the mandatory $200 special assessment for the convictions. Such a sentence is sufficient but not greater than necessary to satisfy the principles set forth in the Sentencing Guidelines and 18 U.S.C. § 3553(a).

I. **BACKGROUND**

On or about August 31, 2017, defendant McElroy was charged by indictment with (1) conspiracy to (a) willfully engage in the business of dealing firearms, (b) willfully transfer, sell, trade, give, transport and deliver firearms to other individuals

who defendant knew and had reasonable cause to believe was not a Michigan resident, and (c) knowingly make any false or fictitious oral or written statement in connection with the acquisition or attempted acquisition of a firearm, in violation of Title 18 United States Code, Section 371 and (2) not being a licensed dealer within the meaning of Chapter 44, Title 18, United States Code and willfully engaging in the business of dealing in firearms. Dkt. No. 1. On October 23, 2019, defendant McElroy pled nolo contendere to both counts of the two-count indictment. Dkt. No. 217.

## II. SENTENCING GUIDELINES

The government agrees with the US Department of Probation's calculations. PSR ¶¶ 42 and 53. Based on an offense level of 21 and a criminal history category of II, the government agrees that the defendant's guideline range is 41 to 51 months' imprisonment, to be followed by 0-3 years of post-release supervision.

### Recommended Conditions of Supervised Release

Given the circumstances of the offense and the history and characteristics of the defendant, the government recommends the maximum term of three years' supervised release.

The applicable mandatory conditions of supervised release under 18 U.S.C. § 3583(d) are set forth on page 20 of the PSR. The government has no objection to the mandatory conditions of release set forth in conditions (1), (2), (5) and (6). The government has no objection to the recommended discretionary and special conditions of Supervised Release set forth on pages 20 through 25 of the PSR, and concurs with

3

the probation officer's rationale for these conditions. Specifically, the government agrees that discretionary conditions (4), (6), (8), and special conditions (1), (2), (3), (11), and (13) promote the statutory factors of affording adequate deterrence to criminal conduct, protecting the public from further crimes by the defendant, and assisting the defendant in reintegrating into society upon his release. Providing defendant with adequate educational and job training will help him achieve employment, which will be crucial in helping prevent recidivism.

The government further agrees that discretionary conditions (1), (7), (9), (14), (15), (16), (17), and (18) promote the statutory factor of allowing for effective monitoring of defendant during any supervised release term imposed.

### III. OVERVIEW OF SCHEME

Defendant McElroy is coming before the Court for sentencing for a wide ranging conspiracy to traffic firearms from the state of Michigan to Chicago and the illegal sale of firearms without a license, in violation of Title 18, United States Code, Sections 371 and 922(a)(1)(A). More specifically, as defendant McElroy does not contest, the government can prove that, on multiple occasions ranging from January 5, 2017 through June 10, 2017, the defendant took part in a straw purchasing scheme that allowed himself and other members of Goonie, a violent Englewood gang, to travel to Michigan and purchase firearms with anonymity. The defendant and his other gang members were hoping to conduct the business of their enterprise without fear of having their names associated with the purchase of the firearms.

In effectuating this scheme, defendant McElroy would contact co-defendant

LaShon Moore or Reginald Johnson through the Facebook Messenger application or through a Facebook call. During this communication, McElroy would engage Moore or Johnson in conversation about firearm transactions, including buying firearms directly from Moore or Johnson or getting firearms from various federal firearm licensed ("FFL") stores in Kalamazoo, Michigan with the assistance of a straw purchaser (an individual that is not going to be the true purchaser of the gun and can legally purchase firearms because he/she does not have a felony record). McElroy, his representative, and the Goonie member would drive to Kalamazoo, Michigan where Moore or Johnson would find a straw purchaser to accompany McElroy or the Goonie member to an FFL, usually On Target or Dunham Sports in Kalamazoo, Michigan. McElroy, his representative, or the Goonie member would go into the store, pick out the firearms he/she wanted to purchase, exit the store, and inform the straw purchaser which firearms to purchase. McElroy, his representative, or the Goonie member would then give the straw purchaser money for the price of the firearms, plus an extra $150 for their services. The straw purchaser would enter the store, fill out the proper forms certifying that the straw purchaser was the true purchaser of the firearm, purchase the firearms, and upon exit, immediately transfer the firearms to McElroy, his representative, or the Goonie member. McElroy, his representative, or the Goonie member would then transport the firearms back to the Chicago area. Defendant McElroy does not dispute that he is accountable for all ten of the firearms purchased during this six month time frame.

## IV. NATURE, CIRCUMSTANCES, AND SERIOUSNESS OF THE OFFENSE

Defendant McElroy does not contest that the government can prove that he was engaged in a six-month conspiracy to arm himself and other Illinois residents with guns purchased in Kalamazoo, Michigan. More particularly, defendant McElroy participated and referred individuals in a scheme that armed violent members of Goonie. The investigation started when numerous firearms that were recovered in the territory of Goonie or from members of Goonie traced back to gun stores out of Kalamazoo, Michigan.

When law enforcement sought to find out who was purchasing the guns and how the guns were making their way from Kalamazoo, Michigan to Illinois, Individual A reached out to McElroy who had the "connection" in Michigan. A couple of recorded conversations between McElroy and Individual A were held. These conversations laid out the entire conspiracy and its operation.

On February 20, 2017, Individual A made a recorded phone call to McElroy. During the conversation, Individual A informed McElroy that he needed a "pipe" because the people on his block were pointing guns at him and acting crazy. McElroy told Individual A that Individual A would have to go to the store. When Individual A asked McElroy when he was going, McElroy stated, "Shit. Ya'll can go up there without me too cuz. Ya'll don't need me to go up there." When Individual A asked what store McElroy was talking about, McElroy stated, "in Michigan." Individual A asked McElroy if he knew the people up there and McElroy stated that Individual A knew them also and identified the people as "Chop and Rico." Individual A, various

6

co-conspirators, surveillance, and other law enforcement techniques assisted to later identified Chop as co-defendant LaShon Moore and Rico as co-defendant Reginald Johnson. McElroy told Individual A, "They gonna get the shit for you." McElroy also told Individual A that he could "hit them on the book" and gave Individual A the Facebook name of Johnson and Moore.

Later in the phone call, McElroy told Individual A about the firearms he had, including a Glock he just bought and some other firearms. McElroy told Individual A that of the firearms he had, he had one for himself and another he had to give his brother when his brother got out of jail. Individual A inquired about another firearm McElroy mentioned, and McElroy stated, "I ain't trying to get rid of it." McElroy continued that two adult Goonie members had just gotten a Glock from him and that some juveniles had a Smith & Wesson. As the phone call ended, McElroy stated that he could provide Individual A with Moore's phone number after they got off the phone.[1]

Subsequently, on February 21, 2017, Individual A placed another recorded phone call to McElroy. Individual A told McElroy that McElroy never sent the phone number for Moore. McElroy stated that he was just up there (in Michigan) last month and gave Individual A the Facebook names for Chop and Rico. Through captured communication and other investigatory techniques, law enforcement later found that the Facebook names given by McElroy belonged to Lashon Moore and Reginald

---

[1] In his sentencing memorandum, defendant attempts to mitigate his conduct by saying that he did not sell guns to Individual A when contacted. The context of the phone call shows that defendant needed the firearms he had and had no problem disposing, selling, or transferring firearms to others if he had extra.

Johnson. Individual A started speaking to McElroy about the firearms and asked, "How much they run?" McElroy replied, "You got to pay for your joint. You got to pay $150 for the motherfucker to get the joint for you." McElroy then stated, "I wouldn't go up there with less than 7 … Take $850 with you … Just depends on what you want." Individual A inquired as to the way the purchase was done. McElroy laid out the plan that was later confirmed during the purchase by Individual A. McElroy stated, "They live up there." Individual A asked, "When we go in the store, they gonna let me get it?" McElroy responded, "Nah. They ain't gonna let you get shit. You gonna go in the store. Figure out what you want. They gonna take you back to the little spot. They gonna send a motherfucker up there with some cash … Then when they come back, you give them the $150. It's sweet cuz. I did the shit a hundred times." Individual A asked and McElroy confirmed that Individual A had to drive to Michigan to get the firearms. McElroy told Individual A, "Guns are misdemeanors out there. You can get as many as you want. They a misdemeanor. You get bumped off, you straight. You be out the same night."

Between February 21, 2017 and February 28, 2017, Individual A communicated with Johnson through recorded phone calls and captured Facebook messages to set up a purchase of firearms. On February 28, 2017, Individual A drove to Kalamazoo, Michigan where he met with co-defendants Moore and Johnson in the parking lot of an apartment complex. Once there, Moore and Individual A proceeded to make small talk. During the conversation, Moore told Individual A that they are "supplying the hood with pipes." Johnson walked over and all the individuals

8

discussed how the purchase of the firearms would work. Johnson told Individual A that he and Individual A would walk into the store together and Individual A would find what he wanted. Moore assured Individual A that it would be fine, "as long as it doesn't look suspicious." On that day, Individual A purchased two firearms with the assistance of a straw purchaser found by Johnson, co-defendant Dalrick Drain.

On or about March 30, 2017, Individual A traveled to Kalamazoo from Chicago to purchase additional firearms. After Drain purchased two firearms for Individual A, Individual A called Moore. In a recorded conversation, Moore told Individual A that he had the firearm and that he was "getting the serial number off it." Moore later provided Individual A with a firearm with an obliterated serial number in exchange for $500.

Subsequently, on or about June 16, 2017, Moore had a recorded telephone conversation with Individual A. Moore stated that a juvenile Goonie member had, "slid like last week. Spent the night. Got a couple poles and got up outta here." Individual A asked, "What you got on hand right now?" Moore responded, "We only got the shit we need but you know a motherfucker line up the store." Individual A replied, "OK, OK. You said Nate [McElroy] and mop stick [nickname for a juvenile Goonie member] came down there?" Moore answered, "Yeah. They slid down here like a week ago. Stayed the night and shit. You know they got two glizzies, two glocks and shit on that store run and they got up outta here." The defendant went on, "But like I say, shit we line people up quick … got a couple motherfuckers already. All we gotta do is let them know and they gonna be ready."

9

The investigation showed that McElroy was in Kalamazoo, Michigan on June 9 and June 10, 2017. ATF firearms records showed that a straw purchaser bought two firearms from On Target in Kalamazoo on June 10, 2017. Video from On Target revealed that the straw purchaser and the former girlfriend of McElroy were in On Target on June 10, 2017 purchasing firearms. Additionally, text messages from McElroy to his former girlfriend showed communication on June 10, 2017 about the purchase of the firearms from On Target.

After purchasing these firearms, McElroy returned from Kalamazoo, Michigan, traveled directly to a home in Calumet City, Illinois, and took two firearms he purchased from Kalamazoo, Michigan into the home. Once inside the home, McElroy and other juvenile and adult members of Goonie, recorded themselves pointing firearms at a camera, crediting their gang for shootings and homicides, and threatening opposition gang members. At least one of the firearms purchased in Michigan was included in the video. Upon leaving, McElroy left the two purchased firearms at the home in Calumet City with the other Goonie members. McElroy did not live at the home in Calumet City.

After he was arrested for this offense, McElroy waived *Miranda* and agreed to speak with law enforcement. For the first hour of the interview, McElroy attempted to distance himself from any association with Goonie, Johnson, and Moore and the trafficking of firearms out of Michigan. After about an hour and fifteen minutes into the interview, after being confronted with some of the evidence against him in this case, McElroy reluctantly began to admit some things related to his arrest. As late as

an hour and thirty minutes into the interview, McElroy was still reluctant to answer questions related to his purchasing firearms in Michigan and bringing them back to Illinois.[2]

Gun violence is a plague upon the streets of Chicago and McElroy placed guns into the hands of violent individuals. In fact, one gun was linked to two shootings and another to two homicides, all in the city of Chicago. A gun that would not have been in the state of Illinois had it not been for the actions of the defendant and his co-conspirators. PSR ¶¶ 23, 37. The defendant and his co-conspirators circumvented the laws that regulate firearms, not for their own protection or any other purpose but to cause havoc upon the streets of Chicago.

The nature and circumstances and seriousness of the offense call for a sentence towards the high end of the guideline range of 41 to 51 months' incarceration, specifically, 51 months' incarceration (on each count to run concurrently), to be followed by three years of post-release supervision.

V.   **HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

Currently McElroy is 23 years old.[3] PSR p. 3. McElroy has three full siblings, three maternal siblings, six paternal siblings, and one child. PSR ¶¶ 66-69, 73. To get him away from the violence of the Englewood neighborhood in Chicago, McElroy's mother sent him to live with relatives in Iowa from the third grade through the

---

[2] Contrary to defendant's assertion, he was not fully cooperative throughout the interview with law enforcement. Though the interview was not hostile, defendant was not entirely honest about his actions in this case and about other things.
[3] Contrary to defendant's sentencing memorandum, McElroy was actually 20 years old when he was arrested for this offense.

11

seventh grade. PSR ¶ 71. Prior to his arrest, the defendant lived in Elgin. PSR ¶ 75. Though he did not admit it, prior to, during, and after this conspiracy, McElroy was a member of Goonie, a violent gang based out of Englewood in Chicago.

There is no dispute that growing up, the defendant had less than ideal circumstances. Though his mom tried to get him away from Chicago, he returned and inserted himself into a violent culture in Englewood. McElroy aligned himself with a violent gang and essentially became one of their weapon suppliers. Guns that he illegally purchased from Michigan ended up in the hands of those that committed heinous acts of violence.

Though his criminal history would have allowed him to legally purchase firearms, the defendant chose to engage in a conspiracy to illegally do so. The only reason could be that he knew the guns would end up in the hands of someone that would use them illegally and he did not want them to be ted back to him. Otherwise, McElroy would have just purchased them like any other law-abiding citizen. Instead, he engaged in a conspiracy that ultimately contributed to the pain and suffering of families and individuals in Chicago.

The history and characteristics of the defendant call for a sentence towards the high end of the guideline range of 41 to 51 months' incarceration, specifically, 51 months' incarceration (on each count to run concurrently), to be followed by three years of post-release supervision.

## VI. ADEQUATE DETERRENCE

Without any care or thought about the consequences, the defendant engaged

in behavior that caused serious harm to Chicago. He got involved in a conspiracy to straw purchase and traffic firearms for the purpose of arming his fellow gang members.

McElroy and the general public need to understand the dangers associated with the illegal straw purchasing and trafficking of firearms in Chicago. Dangerous, untraceable weapons were put on the street and into the hands of violent individuals.

A sentence towards the high end of the guideline range of 41 to 51 months' incarceration, specifically, 51 months' incarceration (on each count to run concurrently), to be followed by three years of post-release supervision is necessary to achieve specific and general deterrence.

## III. Conclusion

For the reasons set forth above, and in consideration of the factors enumerated under 18 U.S.C. § 3553(a), the government respectfully requests that this Court impose a sentence towards the high end of the guideline range of 41 to 51 months' incarceration, specifically, 51 months' incarceration (on each count to run concurrently), to be followed by three years of post-release supervision.

        Respectfully submitted,

        JOHN R. LAUSCH, JR.
        United States Attorney


        By: /s/ *Albert Berry III*
        ALBERT BERRY III
        Assistant United States Attorney
        219 S. Dearborn Street, 5th Floor
        Chicago, Illinois 60604
        (312) 886-7855

Dated: August 16, 2020